NEWTON v MICHIGAN STATE POLICE

Docket No. 247482. Submitted May 11, 2004, at Detroit. Decided August 10, 2004, at 9:05 A.M.

Donna Newton, personal representative of the estate of John Newton, deceased, brought actions consolidated in the Emmett Circuit Court against the Michigan State Police and Trooper John A. Janicki, seeking damages for the injuries and death of John Newton that resulted from Newton's vehicle being hit while crossing an intersection by the trooper while the trooper was driving a Michigan State Police (MSP) vehicle and was responding to a notice of a breaking and entering in progress. The court, Scott L. Pavlich, J., granted summary disposition for Janicki on the basis that the plaintiff had not made a sufficient showing of gross negligence to establish personal liability under MCL 691.1407(2)(c), a governmental immunity statute. The court denied summary disposition for the MSP on the basis that the question raised was not based on a legal question of whether governmental immunity applies to the MSP, but whether the facts in the case were sufficient to sustain the claim of negligence. The court ruled that genuine issues of fact concerning speed, timing, traffic conditions, and other factors precluded a grant of summary disposition for the MSP. The MSP appealed.

The Court of Appeals *held*:

1. Because the MSP appealed a denial of its motion for summary disposition on the basis of fact questions, as opposed to governmental immunity, it did not have an appeal of right without a final order or judgment. MCR 7.202(7)(a)(v) and 7.203(A)(1). The Court of Appeals nevertheless treated the appeal of right as an application for leave to appeal, and granted leave. The fact that the trial court also granted summary disposition to the officer on the basis of governmental immunity does not make the decision not to grant the MSP motion, which decision was based on questions of fact, a final order for the purpose of the immediate appeal.

2. The trial court correctly determined that there were genuine issues of material fact concerning speed, timing, where people were looking, and traffic conditions that prevented it from granting summary disposition for the MSP.

Affirmed.

APPEAL — TORT ACTIONS AGAINST GOVERNMENTAL AGENCIES — DENIALS OF SUMMARY DISPOSITION — FACTUAL QUESTIONS.

In a tort action against a governmental agency, the governmental agency may not appeal as of right, but may appeal only by leave granted, the denial of its motion for summary disposition if the basis for the denial is the plaintiff's presentation of genuine issues of material fact, rather than governmental immunity, because the denial is not a final order or judgment that is appealable as of right (MCR 7.202[7][a][v], 7.203[A][1]).

*Garrett & Stevenson, P.C.* (by *Jon R. Garrett*), for the plaintiff.

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, and *James T. Farrell*, Assistant Attorney General, for the Department of State Police.

Before: OWENS, P.J., and KELLY and R. S. GRIBBS*, JJ.

OWENS, P.J. Defendant Michigan Department of State Police appeals as of right from an order denying its motion for summary disposition.[1] We affirm.

. FACTUAL AND PROCEDURAL BACKGROUND

On September 16, 2000, Michigan State Police Trooper John Janicki was responding to a reported breaking and entering in progress when he collided with a vehicle driven by the decedent, John Newton. According to the factual allegations contained in the complaint and the facts revealed during deposition testimony Trooper Janicki was driving north on US-31 at a high rate of speed when the decedent pulled out in

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

[1] The trial court granted individual defendant John A. Janicki's motion for summary disposition and that order has not been appealed. Therefore, references in this opinion to "defendant" are to the Michigan State Police.

front of him from a side road. Janicki was unable to avoid the decedent's vehicle, and the vehicles collided with resultant severe injuries to the decedent.

In a complaint filed in the Emmett Circuit Court, plaintiff[2] alleged that Janicki was grossly negligent in the operation of his patrol car and that, as a proximate result, the decedent suffered severe injuries. Plaintiff also alleged that the vehicle driven by Janicki was owned by the Michigan State Police and that MCL 691.1405 specifically exempted Janicki from governmental immunity. On October 15, 2001, plaintiff filed a complaint against defendant in the Court of Claims; this complaint was virtually identical to the initial complaint filed in Emmet Circuit Court.[3]

Janicki moved for summary disposition, claiming that, because he was performing a governmental function, under MCL 691.1407(2)(c), he could only be held personally liable for gross negligence in the operation of his state-owned vehicle, but plaintiff had alleged both that Janicki was grossly negligent *and* that he was merely negligent in the operation of his vehicle.[4] Janicki also claimed that plaintiff had failed to allege that Janicki's negligence was "the" proximate cause of the

---

[2] Newton died on October 28, 2001, of the injuries he suffered in the collision and his wife was substituted as the sole plaintiff as personal representative of Newton's estate. Therefore, all references to "Newton" in this opinion will be to decedent and all references to "plaintiff" are to Newton's wife, Donna, in her capacity as personal representative.

[3] On February 12, 2002, pursuant to the stipulation of the parties, the Court of Claims entered an order consolidating the lawsuits and providing that further proceedings in both cases should be in the Emmet Circuit Court.

[4] Pursuant to MCL 691.1407(2)(c), because Janicki was acting in the course of his employment, in order to hold him personally liable plaintiff had to prove that Janicki was *grossly* negligent; i.e., that he engaged in "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *Id.*

accident. Plaintiff responded that the complaint alleged, and the evidence demonstrated, that Janicki operated his state-owned vehicle in a grossly negligent manner; plaintiff further requested leave to amend the complaint to allege that Janicki's conduct was "the" proximate cause of the accident. The trial court entered an order on February 19, 2002, granting Janicki's motion for summary disposition in part with regard to plaintiff's claim against Janicki for simple negligence. The trial court ruled that plaintiff could file an amended complaint within thirty days to substitute "an appropriate person" for the decedent and also directed plaintiff that any theory of recovery asserted against Janicki must comply with the holding of *Robinson v Detroit*, 462 Mich 439; 613 NW2d 307 (2000).

Plaintiff then filed an amended complaint that essentially repeated the allegations of the initial complaint, but that specified that Janicki was "grossly" negligent, that Janicki's grossly negligent conduct was "the" proximate cause of the decedent's injuries and subsequent death, and that, under MCL 691.1405, defendant was exempted from the protection afforded by governmental immunity because of Janicki's gross negligence. Plaintiff subsequently sought, and was granted, permission to file a second amended complaint. The second amended complaint reiterated the allegations that applied to Janicki that were already set out in plaintiff's first amended complaint, but deleted the allegations concerning MCL 691.1405 that applied to defendant because those were covered by the lawsuit plaintiff had filed in the Court of Claims.

On January 30, 2003, defendant and Janicki moved for summary disposition in the consolidated cases. Essentially they argued that plaintiff had not established that Janicki operated his vehicle with either

gross or ordinary negligence and therefore he was not individually liable and neither was defendant.

The trial court ruled that, even considering the facts in the light most favorable to plaintiff, it could not find that plaintiff had made a sufficient showing of gross negligence. Therefore, the trial court granted the motions for summary disposition insofar as they claimed that Janicki had been grossly negligent. That essentially ended the case with regard to Janicki because he could only be individually liable if plaintiff could demonstrate that he was grossly negligent.

However, with regard to defendant, the trial court ruled:

> Again, I have to take things in the light most favorable to the non-moving party, which is the plaintiff. There is [sic] issues of speed. There is [sic] issues of visibility, issues of timing, where people were looking when, for how long, what was the traffic like. Many factors would come into this and make that determination and on this record I can't say that plaintiff could not prevail. And that's about what I have to find to grant this motion on that issue and I can find that and make that ruling as to gross negligence, but I can't as to simple negligence, so [I] grant it in part and deny it in part.

An order granting summary disposition in part (with regard to Janicki) and denying summary disposition in part (regarding defendant) was entered on March 19, 2003. Defendant filed a claim of appeal from this order and moved for a stay of the trial; this Court issued an order on April 1, 2003, granting the stay. That same day, the trial court issued an opinion and order (it was not entered with the county clerk's office until the next day, April 2, 2003) that denied defendant's motion to stay the trial. This opinion and order reasoned that defendant was not entitled to an automatic stay of proceedings because, in the trial court's view, defendant's

motion for summary disposition was not denied on the basis of the governmental immunity claim. Rather, the court stated that it denied summary disposition because

> [t]he Defendant, Michigan State Police's request for summary disposition was not based on a legal question of whether the law of governmental immunity bars the suit but instead was an argument that the facts in the case at bar were not sufficient to sustain the claim of negligence thereby entitling it to a grant of summary judgment.

Following this Court's acceptance of defendant's claim of appeal, the trial court entered its own order staying the trial.

## II. THE JURISDICTIONAL ISSUE

In her brief on appeal, plaintiff contests this Court's jurisdiction to hear this appeal as an appeal of right. Plaintiff asserts that the order granting summary disposition in part and denying it in part, from which defendant has claimed an appeal, is not a final order within the meaning of MCR 7.203(A) and MCR 7.202(7)(a)(v). Because the right to an appeal pursuant to these court rules has not been the subject of a previous published decision, we will first discuss the procedural jurisdictional issue and then deal with the substantive issue regarding the denial of the motion for summary disposition with respect to defendant. This issue concerns the interpretation of statutes and court rules, legal issues that are reviewed de novo. *McAuley v Gen Motors Corp,* 457 Mich 513, 518; 578 NW2d 282 (1998).

The Michigan Court Rules indicate the conditions according to which an appeal of right may be taken. MCR 7.203(A) provides in part:

> Appeal of Right. The court has jurisdiction of an appeal of right filed by an aggrieved party from the following:

(1) A final judgment or final order of the circuit court or the court of claims, as defined in MCR 7.202(7), except a judgment or order of the circuit court

(a) on appeal from any other court or tribunal;

(b) in a criminal case in which the conviction is based on a plea of guilty or nolo contendere;

An appeal from an order described in MCR 7.202(7)(a)(iii)—(v) is limited to the portion of the order with respect to which there is an appeal of right.

The last sentence of MCR 7.203(A)(1) refers to the June 4, 2002, amendments to MCR 7.202(7)(a), which added to the definition of the terms "final judgment" or "final order." Defendant claims that the order granting and denying summary disposition is a final order pursuant to the following definition in MCR 7.202(7):

"final judgment" or "final order" means:

(a) In a civil case,

* * *

(v) An order denying governmental immunity to a governmental party, including a governmental agency, official, or employee[.]

The plain language of these court rules, interpreted in a common-sense fashion, leads us to conclude that this exception applies only to situations in which the denial of summary disposition is directly based on a finding that the moving party is not entitled to government immunity and not to a situation where, although a claim of governmental immunity has been asserted, the trial court denies a summary disposition motion because the party opposing summary disposition has stated a sufficient factual case to avoid summary disposition—in other words, as in this case, in which the motion is actually disposed of as a MCR 2.116(C)(10) motion rather than a (C)(7) motion.

For example, in this case the trial court's decision was based on its conclusion that there were disputes with respect to several dispositive material facts concerning whether Janicki had driven negligently and that these factual disputes precluded summary disposition; the court's decision did not involve a determination whether defendant was entitled to summary disposition because of governmental immunity. In fact, the trial court specifically disavowed that its ruling was a determination regarding governmental immunity, but insisted instead that it was a ruling on the factual sufficiency of plaintiff's pleadings:

> The Defendant, Michigan State Police's request for summary disposition was not based on a legal question of whether the law of governmental immunity bars the suit but instead was an argument that the facts in the case were not sufficient to sustain the claim of negligence thereby entitling it to a grant of summary judgment [sic].

The jurisdictional issue in this case arises from the interaction of MCL 691.1405[5] with the court rules. Under § 1405, a governmental agency, such as the Michigan State Police, is not entitled to governmental immunity if one of its employees causes bodily injury or property damage in the negligent operation of a motor vehicle owned by the agency. Here, there is no dispute that Janicki was an employee of a governmental agency (the Michigan State Police) and that he was driving an agency-owned vehicle when he collided with the dece-

---

[5] MCL 691.1405 provides:

Governmental agencies shall be liable for bodily injury and property damage resulting from the negligent operation by any officer, agent, or employee of the governmental agency, of a motor vehicle of which the governmental agency is owner, as defined in Act No. 300 of the Public Acts of 1949, as amended being sections 257.1 to 257.923 of the Compiled Laws of 1948.

dent's vehicle and caused both bodily injury and property damage. Therefore, the key determination from defendant's standpoint was whether Janicki was negligent in the operation of the vehicle because a finding of negligent operation would trigger potential liability under MCL 691.1405. This is primarily a factual determination based on the pleadings and any documentary evidence submitted by the parties—in other words, a C(10)-type motion—and that is how it was treated by the trial court.

In our opinion, the trial court did not make a legal determination concerning whether defendant was entitled to claim governmental immunity. Instead, the trial court made a determination that there were genuine issues of material fact to be resolved by the trier of fact. Therefore, the appeal in this case was taken from a C(10) determination rather than a C(7) determination. The order from which defendant claimed an appeal was therefore not a final order under MCR 7.202(7)(a)(v) and MCR 7.203(A)(1). Accordingly, defendant was required by the court rules to file an application for leave to appeal rather than a claim of appeal.

Nevertheless, given plaintiff's failure to move to dismiss defendant's claim of appeal, the fact that there has not heretofore been any definitive guide to the interpretation of MCR 7.203(A)(1) and MCR 7.202(7)(a)(v), and the fact that this jurisdictional claim is only now being formally addressed—long after defendant could have taken steps to correct any deficiency, we choose to treat the defective claim of appeal as an application for leave to appeal and to grant leave to consider the substantive issue raised by the appeal. *In re Investigative Subpoena re Homicide of Lance C Morton,* 258 Mich App 507, 508 n 2; 671 NW2d 570 (2003).

### III. THE SUMMARY DISPOSITION ISSUE

This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Maiden v Rozwood,* 461 Mich 109, 118; 597 NW2d 817 (1999). A motion under MCR 2.116(C)(10) tests the factual sufficiency of a claim. *Smith v Globe Life Ins Co,* 460 Mich 446, 454; 597 NW2d 28 (1999). In *Quinto v Cross & Peters Co,* 451 Mich 358, 362-363; 547 NW2d 314 (1996), our Supreme Court summarized the standards for reviewing a C(10) summary disposition motion:

> In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue of any material fact, and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4).

Both sides supplemented their motion and answer with deposition testimony. Briefly summarized, the deposition testimony of the witnesses was as follows:

Trooper Janicki stated that he was driving north on US-31 at a high rate of speed with his lights and siren activated. He observed a county sheriff's department car ahead of him; although he could not hear the sheriff's car's siren, he could see its blue strobe lights. Janicki slowed as he came to the intersection of US-31 and M-119, but he then accelerated as he cleared the intersection. He saw a Dodge Caravan ahead approaching US-31 on Manvel Road. It did not appear that the van was going to stop, so Janicki "spiked" his brakes briefly. The van then appeared to stop at the intersec-

tion of Manvel and US-31, so Janicki accelerated again. At that point, the van suddenly "shot out" into the intersection and Janicki instinctively attempted to veer left to avoid it, but struck the van in its driver's side door. Janicki insisted his lights and siren were on before the crash, but he stated that he shut off the siren and perhaps the lights when he came to a stop after the crash.

Maxine Holmes testified that on September 16, 2000, she was driving north on US-31 with her husband when she was startled by a state police car "zooming" past on the left-hand side in the middle lane of traffic. The vehicle had its lights going, but she could not remember hearing a siren. She acknowledged that she was preoccupied and was listening to a country music tape; she could not estimate the police car's speed, and she could not honestly say she remembered the siren, but she did remember the lights.

Maxine's husband, DeWayne Holmes, testified that the police car passed them, but he could not remember if the car had its lights or siren on. He admitted he had the car windows rolled up and was listening to country music, but he stated it was not loud.

Christine Wagenschutz testified that she was at the intersection of Division and US-31 on September 16, 2000, shortly after 9:00 P.M., when she heard a police siren. She stated she stopped and waited for the police car to drive by; she recalled that it was a state police car with its lights and siren on. She "assumed" the flashing "wig-wag" lights were activated on the front of the vehicle because "something made [her] stop and take note." After the police car passed, she turned onto US-31 and drove north. She subsequently came on the accident scene and attempted to assist Trooper Janicki; she recalled that his patrol car's lights were still going,

but she did not think his siren was still activated. As she attempted to stabilize Trooper Janicki's neck, he was saying, "he pulled out right in front of me. There's nothing I could have done."

Robert Wicker testified that a state police car passed him, but he did not recollect that the car had its lights on. He also did not remember hearing its siren, but he admitted his radio was quite loud.

Laura Mulholland testified that she was stopped at a traffic light as she was leaving the Glen's Market parking lot when a county sheriff's department car went through the intersection with its lights and sirens going. About thirty seconds later, a state police car went through the intersection with its lights and siren activated. When these cars had passed by, she turned onto US-31; she could still see the state police car ahead with its lights and siren on. She stated that the state police car had a red light at the intersection, so it slowed down to about thirty-five miles an hour; even when it accelerated, it was not going at an excessive speed. When she drove past the collision scene, she was not sure if the car's lights and siren were still on.

Christopher Wormell stated that he was sitting in the bar in the La Señorita restaurant facing out the window toward US-31 when he saw a state police car "fly by" with its top "bubble light" on. He could not hear a siren, but he admitted that with three or four televisions on in the bar and people talking, he did not know if he could have heard a siren. Wormell stated that he did not see the accident occur and he also admitted that the police car was not going extremely fast when he saw it, but it was going faster than the other traffic.

Michael Royalty, an employee of the La Señorita restaurant, stated that he was in the enclosed patio

room of the restaurant on his break watching a Red Wings game on the television when the red light of a state police car drew his attention to the window. He did not hear a siren, but he explained that the television was on and he believed the windows were closed. He watched the state police car drive up the hill on US-31—he estimated the speed was about seventy miles an hour—and he observed a minivan approach the stop sign at the Manvel Road intersection, stop, and then proceed onto US-31 in front of the state police car "as if there was no traffic coming." Royalty testified that he saw a brake light from the state police car go on briefly just before the vehicles collided.

Dennis Kenville, the manager of the La Señorita restaurant, testified that he was sitting in the patio room overlooking the street on September 16, 2000, when his attention was drawn outside by a police car siren. He stated that a police car went through the M-119 and US-31 intersection with its lights and siren going, proceeded north on US-31 at about sixty to seventy miles an hour, and collided with a vehicle that pulled out of a side road in front of it.

Matthew Sura, an employee at the La Señorita restaurant, testified that on September 16, 2000, he was in the patio room of the restaurant having dinner with Kenville and watching a football game on the television. His attention was drawn by a police siren; he turned and watched as a Michigan State Police car went through the intersection of M-119 and US-31. Sura recalled that the state police car had its emergency lights and siren on; Sura believed the restaurant windows were open. Sura watched the police car slow for the intersection and then "gun it" and continue until it collided with a van that pulled out in front of it. The collision occurred in the center lane of the roadway.

Sura said it looked to him like the van stopped and then pulled out onto US-31 normally; he did not see the state police car's brake lights go on. Sura stated that the state police car's siren and lights did not turn off at any time before the accident occurred.

Trooper Douglas Sundmacher testified that he and his partner, Trooper Brian Krakowski, were requested to back up Trooper Janicki as he responded to a reported breaking and entering. As they went to their vehicle, Sundmacher saw Janicki drive by in his patrol car with the lights and siren activated. He subsequently learned of the accident and went to the scene; he could not recall if Janicki's lights and siren were still on. Trooper Krakowski also stated that he saw a state police car drive by on US-31 with its lights and siren on as he and Sundmacher walked to their patrol car.

Deputy Sheriff Michael Keiser of the Emmet County Sheriff's Department testified that he responded to a "breaking and entering in progress" call on September 16, 2000. He drove north on US-31 with his siren and lights activated. After he cleared the M-119 intersection, Keiser accelerated and was "running hot" as he drove north. Keiser stated that as he was driving on US-31, he looked in his rearview mirror and saw Janicki's car with its emergency lights and its "wig-wag" lights on following him. When he subsequently heard about the accident, he returned to the scene and conducted an accident investigation. He stated that, following his investigation, he concluded that the decedent was responsible for the accident because he failed to yield. Keiser acknowledged that estimates of Janicki's speed varied from sixty-five miles an hour to fifty-one or fifty-two miles an hour. He believed that even if the sixty-five miles an hour estimate was used, that was pretty close to the speed he was driving along

the same stretch of roadway. He did not recall any vehicle stopped at the Manvel Road intersection when he drove past.

Deputy Sheriff Scott Chamberlin of the Emmet County Sheriff's Department stated that he did an accident reconstruction several nights after the collision. He was requested to do a speed determination and he calculated that, at the time Janicki reacted to the van pulling in front of him, his speed was in the range of sixty to sixty-five miles an hour. He estimated the van's speed at nine to eleven miles an hour at the time of impact; he was not requested to calculate the impact speed for Janicki's vehicle. Chamberlin believed the speed limit on US-31 at the location of the accident was forty-five miles an hour.

Steven Rains, an accident reconstructionist employed by the Michigan State Police, testified that he did a reconstruction of the September 16 accident. He concluded that the speed of the state police car was forty-seven to fifty-one miles an hour at the point of impact; the maximum speed before impact—at the point when the state police car began to "yaw" or veer—was calculated at sixty miles an hour.

Plaintiff also submitted the affidavit of Richard Sanderson, an expert accident reconstructionist, who concluded, after reviewing all the available data, that the accident would not have occurred if (1) Janicki continued to observe plaintiff's vehicle until he passed it (rather than allegedly taking his eyes off it to watch further ahead), (2) he discontinued full acceleration when the decedent started to pull out onto US-31, (3) he applied his brakes when he saw the decedent start to pull out, or (4) he limited his speed to ten miles over the speed limit.

An emergency vehicle is permitted to exceed the speed limit provided that it complies with certain requirements. MCL 257.603.[6] A driver confronted by an approaching emergency vehicle is required to stop and yield the right of way. MCL 257.653.[7] A driver approach-

[6] MCL 257.603 provides, in relevant parts:

(2) The driver of an authorized emergency vehicle when responding to an emergency call . . . may exercise the privileges set forth in this section, subject to the conditions of this section.

(3) The driver of an authorized emergency vehicle may do any of the following:

\* \* \*

(b) proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation.

(c) Exceed the prima facie speed limits so long as he or she does not endanger life or property.

\* \* \*

(4) The exemptions granted in this section to an authorized emergency vehicle apply only when the driver of the vehicle while in motion sounds an audible signal by bell, siren, air horn, or exhaust whistle as may be reasonably necessary . . . and when the vehicle is equipped with at least 1 lighted lamp displaying a flashing, oscillating, or rotating red or blue light visible under normal atmospheric conditions . . . .

[7] MCL 257.653 provides, in relevant parts:

(1) Upon the immediate approach of an authorized emergency vehicle equipped with not less than 1 lighted flashing, rotating, or oscillating lamp exhibiting a red or blue light visible under normal atmospheric condition . . . and when the driver is giving audible signal by siren, exhaust whistle, or bell:

(a) The driver of another vehicle shall yield the right of way and shall immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the roadway, clear of an intersection, and shall stop and remain in that position until the

ing a stop sign is required to stop and yield the right of way to a vehicle "which has entered the intersection from another highway or which is approaching so closely on the highway as to constitute an immediate hazard during the time when the driver would be moving across or within the intersection." MCL 257.649(6). With regard to vehicle speed as an explanation for an accident, MCL 257.633(2) provides that "speed limitations shall not be construed to relieve the plaintiff in a civil action from the burden of proving negligence on the part of the defendant as the proximate cause of an accident." Moreover, police officers are exempt from speed limits "when traveling in emergencies" provided that "the driver of the vehicle while in motion sounds an audible bell, siren or exhaust whistle as may be reasonably necessary or when the vehicle is equipped with at least 1 lighted lamp displaying a flashing, oscillating or rotating red or blue light" except this exemption does not "protect the driver of the vehicle from the consequences of a reckless disregard of the safety of others." MCL 257.632.

"[E]mergency vehicles must be driven with due regard for the safety of others." *Fiser v City of Ann Arbor,* 417 Mich 461, 472; 339 NW2d 413 (1983), citing *Kalamazoo v Priest,* 331 Mich 43, 46; 49 NW2d 52 (1951). As our Supreme Court reaffirmed in *Robinson, supra* at 445, "an officer's physical handling of a motor vehicle during a police chase, can constitute 'negligent

---

authorized emergency vehicle has passed, except when otherwise directed by a police officer.

\* \* \*

(2) This section does not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of persons using the highway.

operation . . . of a motor vehicle' within the motor vehicle exception." (Citation omitted.) We conclude that an officer's physical handling of a motor vehicle during the course of responding to an emergency call can also constitute negligent operation of a motor vehicle.

The trial court found that there were genuine issues of material fact concerning speed, visibility, timing, where people were looking, and traffic conditions that prevented it from granting summary disposition. We concur.

The witnesses' testimonies indicate that some witnesses heard a siren and saw lights displayed on Janicki's vehicle. Other witnesses testified that they saw lights, but did not hear a siren. One witness testified that he did not see lights or hear a siren. There was also inconsistent testimony concerning whether Janicki braked his vehicle before the impact; even if he did not, there may be a dispute whether it was possible to do so. Janicki was only able to utilize the exemptions from the speed limits and other driving rules if he had both his flashing light[8] and his siren activated. MCL 257.603(4); MCL 257.653(1). Although the bulk of the testimony suggests that Janicki was in compliance, and testimonial discrepancies can be explained, it is not the function of the trial court in deciding a motion for summary

---

[8] Plaintiff makes an argument concerning missing light bulbs, suggesting, apparently, that it cannot be determined if Trooper Janicki's emergency lights were properly working at .the time of the accident because the light bulbs have vanished. Deputy Chamberlin's testimony indicates that the bulbs were missing from the patrol car's *headlights*. Although those lights were "wig-wags"—flashing headlights—the statutes require the emergency vehicle to display red or blue flashing lights visible from 500 feet in a 360-degree arc. MCL 257.603(4). We conclude that requirement applies to an overhead or roof light—not a headlight. Therefore, the missing bulbs do not suggest that Janicki did not comply with the statute.

disposition—or this Court in reviewing such a decision—to make such determinations of witness credibility. *Skinner v Square D Co,* 445 Mich 153, 161; 516 NW2d 475 (1994), citing *Zamler v Smith,* 375 Mich 675, 678-679; 135 NW2d 349 (1965). Instead, it must consider the evidence in a light most favorable to the nonmoving party (here, plaintiff) and deny summary disposition if there is a genuine issue of material fact. *Quinto, supra* at 362.

Considered in a light most favorable to plaintiff, the testimony presented by the parties indicates that there were genuine issues of material fact. Therefore, we conclude that the trial court acted correctly by denying defendant's motion for summary disposition.

Affirmed.